| iTRAYLOR, Justice.*
This ease comes before us on direct appeal pursuant to La. Const, art. IV, § 21(E) for our review of a ruling by the trial court affirming Louisiana Public Service Commission (LPSC) Order U-21270-A. The Order directs Entergy Louisiana (Entergy) to rebill Utility Telephone Control (UTC) operated cotton gins pursuant to Entergy’s General Service Rate Schedule retroactively to February 1, 1988. Because we find that the LPSC did not act arbitrarily or capriciously in reaching its decision, we affirm.
FACTS
This action commenced when UTC filed suit on behalf of nineteen owners/operators of cotton gins, alleging that Entergy had overcharged the cotton gins for electric service from February 1, 1988 through December 31, 1994. UTC contended that Entergy had charged the cotton gins pursuant to the Cotton Gin Service Rate Schedule (Gin Rate) rather than the more economical Small General Service Rate Schedule (GS Rate). The UTC gins claimed that they were entitled to a refund of the amount overpaid because (1) Entergy had failed to advise them of the availability of the GS rate in violation of the LPSC General Order of November 2, 1987; (2) Entergy discriminated ^against the UTC gins by charging them for service according to the Gin Rate, while according other gins service under the GS Rate; and (3) the Gin Rate did not apply to the electric service provided to the UTC gins.
The LPSC ruled that the language of the Gin Rate was ambiguous and should not have been used to either exclude or require application of the Rate to the UTC gins; that because there were two rates applicable to the UTC gins and Entergy had not notified the UTC gins of the more economical rate, Entergy had violated the LPSC General Order of November 2, 1987; and, finally, that Entergy had discriminated against the UTC gins by making the lower rate available to some, but not all, of its cotton gin customers. The Commission ordered Entergy to refund $2,153,529.41 to the UTC gins, the amount stipulated by the parties as the difference between the rate charged according to the Gin Rate and that collectible under the GS Rate.
STANDARD OF REVIEW
An order of the Public Service Commission should not be overturned unless it is arbitrary and capricious, a clear abuse of authority, or not reasonably based upon the factual evidence presented. Alma Plantation v. Louisiana Pub. Serv. Comm’n, 96-1423 (La. 1/14/97); 685 So.2d 107, 109-10. The function of the reviewing court is not to reevaluate and re-weigh the evidence, or to substitute its judgment for that of the Commission. Washington St. Tammany Electrical Coop., Inc. v. Louisiana Pub. Serv. Comm’n, 95-1932 (La.4/8/96); 671 So.2d 908, 912. The Commission is entitled to deference in its interpretation of its own rules and regulations, though not in its interpretations of statutes and judicial decisions. Alma Plantation, 685 So.2d at 110. The Commission’s interpretation and application of its own General Orders deserve great weight because the Commission is in the best position to apply them. Dixie Electric Membership Corp. v. Louisiana Pub. Serv. Comm’n, 441 So.2d 1208, 1211 (La.1983).
DISCUSSION
Entergy argues that the LPSC erred in concluding that Entergy violated the ^Commission’s General Order of November 2, 1987 and in concluding that Entergy discriminated against the UTC cotton gins.
The General Order requires in pertinent part that:
*219 1. The electric utility companies subject to the jurisdiction of [the] Commission ... are ... directed to establish a program to review, at least once a year, the retail commercial customers’ billing records ... to identify those customers whose billing records indicate that they may have lower utility bills if they were to receive the same service under a different Rate Schedule than the Rate Schedule their current bills are computed under.
2. Once the electric utility companies identify the eligible customers who could benefit from a shift from one Rate Schedule to another Rate Schedule, the companies shall contact such customers and advise them, in writing, of the possible savings that can be' achieved.
Because the General Order requires the identification of which of several rates is most economical, in order to determine whether the order was violated we must first examine whether the UTC gins were eligible for service under two different rates. The LPSC found that Entergy could have served the UTC gins under either the Gin or GS Rates. The two rates read in pertinent part:
Cotton Gin Service Rate Schedule (Gin Rate)
APPLICATION
To electric service for the ginning of cotton, when the entire power requirements for that purpose are supplied by Company, at one point of delivery and are measured through one kilowatt-hour meter. Service hereunder is subject to any of the Company’s rider schedules that may be applicable. Service under this schedule shall not be resold, sub-metered, used for standby, or shared with others.
Small General Service Rate Schedule (GS Rate)
APPLICATION
To electric service for which no specific rate schedule is provided, when all such service required by Customer is supplied by Company, at one point of delivery, and is measured through one kilowatt-hour meter. Service hereunder is subject to any of the Company’s rider schedules that may be applicable. Service under this schedule shall not be resold, sub-metered, used for standby, or shared with others.
Entergy argues that because the GS rate applies only when “no specific rate schedule is provided,” the two rate schedules are mutually exclusive, thereby removing 14the possibility that Entergy could have violated the General Order.
The LPSC found, however, that the language of the Gin Rate was ambiguous and could be used neither to require nor to exclude application of the rate to the Cotton Gins. In reaching this conclusion, the LPSC conducted an exhaustive review of the history of the development of the Gin Rate as well as taking notice of Entergy’s past application of the rate.
The LPSC found that the Gin Rate was first established in 1927 as a “class rate,” affecting customers who used a fairly high load of electricity during a short period of time. Cotton ginning season at that time lasted for approximately two months, August and September, the peak period for electricity usage. Because ginning occurred during the peak load time, the Gin Rate cost more per kilowatt hour than some other rates.
In order to make certain that cotton gins were powered by electricity rather than by fossil fuels, the earliest Gin Rate contained language in its Application section providing that the rate was applicable for energy used only by slip ring type electric motors used in ginning. As ginning technology improved, later versions of the Gin Rate gradually eliminated the requirement for “slip ring type” electric motors, while adding language ensuring that “the entire power requirements for [ginning] are supplied by the Company.”
Because of the improved technology of ginning, harvesting, and growing cotton, the ginning season began to fall later, now occurring generally in October and November, outside the peak load time. Further, gins began to co-locate other business activities at the ginning site, thereby guaranteeing electric usage, throughout the year. At the same time, gins began to use natural gas or butane driers to dry the cotton fibers.
Entergy employees who were responsible for contracting for electric service with the *220 gins testified that some cotton gins were served under the GS Rate while most others remained subject to the Gin Rate. Gins which were allowed to be billed under the GS Rate had been advised by Entergy representatives to connect their non-gin related facilities to the gins, and were subsequently billed for all service, including the cotton gin, | sunder the GS Rate. Witnesses for the Cotton gins testified, however, that some gins were billed under the Gin Rate even though unrelated facilities were metered along with the gins.
An Entergy account service representative with responsibility for ensuring that customers are charged under the proper rate testified during deposition that cotton gins which were provided service on the same meter with other non-ginning facilities were to be billed under the GS rate. At trial, however, he testified that gins, whether on the same meter with unrelated facilities or not, should be billed under the Gin Rate, while the unrelated facilities should be billed separately under the GS Rate. He further testified that his interpretation of the rate had changed between the time of his deposition and trial.
The witnesses also testified as to the effect the gas cotton driers had on the applicability of the different rate schedules. The UTC gins’ witnesses testified that the gas or butane used to power the driers is a significant portion of the power requirement of the gins. Entergy witnesses disagreed as to the effect the gas driers should have on rate scheduling, some testifying that the presence of the driers was never considered when deciding which rate schedule to use.
Entergy argued at trial and again on appeal that the gas driers do not displace any electrical load supplied by the company and that, therefore, they are not “competitive equipment.” An internal Entergy document, an “Electric Service Agreement Checklist,” however, refutes that contention by describing the gins’ gas driers as competitive equipment. Further, one Entergy employee admitted that although Entergy never considered the presence of the driers in determining the correct rate schedule, if the gas driers were an essential part of the ginning process, the gins were not all-electric.
As previously stated, the LPSC found that the language of the Gin Rate was ambiguous and should, therefore, be construed against the drafter of the rate schedule. Because there is evidence that even the experienced Entergy employees responsible for applying the different rates were uncertain of which rate should apply to the UTC gins, |6that those same employees disagreed on the effect the presence of gas driers had on the applicability of the Gin Rate, and that Enter-gy apparently promulgated the Gin Rate without considering the effect the gas driers would have on the rate schedule, the LPSC’s determination is reasonably based upon the factual evidence and, therefore, is not arbitrary or capricious.
Because either of the two rates could have been applied to the UTC cotton gins, the LPSC General Order of November 2, 1987 required Entergy to review its records and notify the UTC gins of the most economical rate. Entergy stipulated at trial that the General Order of November 2, 1987 was applicable to Entergy; that Entergy did not apply for an exemption from the order with regard to the UTC gins; that Entergy did not notify the UTC gins that they could change from the Gin Rate to the GS Rate; that if the UTC gins were not charged properly during the years in question, they would have been properly charged under the GS Rate; and that the UTC gins were not addressed in annual reports required to be filed with the LPSC.
Further, according to an Entergy internal memorandum dated March 4, 1988, seven gins- in the state were served according to the GS Rate while thirty-six gins (including the nineteen UTC gins) were served under the Gin Rate. This memorandum, which was authored shortly after the issuance of the LPSC General Order, pointed out that significant savings could be realized by the gins served under the Gin Rate and recommended that either the Gin Rate be adjusted or the GS Rate be made available to all cotton gins. Another Entergy memorandum dated July 7, 1994 also advised that significant savings could be gained for the gins by moving them to the GS Rate. Entergy admitted that it did not offer any of the UTC gins the opportuni *221 ty for service under the GS Rate, even though many of the gins requested relief,
Again, because there is ample evidence to support the LPSC’s finding, the Commission was not arbitrary and capricious in determining that Entergy violated the LPSC General Order of 1987.
17Finally, the LPSC found that Enter-gy discriminated against the UTC gins by allowing some cotton gins to purchase electricity under the GS Rate while forcing the UTC gins to use the Gin Rate. One former Entergy employee testified that, rather than advising gins which asked for help in lowering electricity costs to combine services, he conducted an independent analysis of each customer’s situation and requested Entergy to combine the services only when he thought he could get permission. Although he testified that he showed no favoritism while formulating his requests, a letter he wrote to Entergy recommending a rate change mentioned that the gin owner’s were “very influential community members.”
Because this evidence supports the LPSC’s determination that Entergy discriminated against the UTC gins by allowing other gins to profit by obtaining electricity at a lower rate, the LPSC was not arbitrary or capricious.
HOLDING
For the foregoing reasons we affirm the ruling of the trial court.
AFFIRMED.

 Marcus, J., not on panel. See Rule IV, Part 2, § 3.