9 So.3d 63 (2009)
Reverend C.S. GORDON, Jr., J. Michael Malec, Darryl Malek-Wiley, Willie Webb, Jr., and Maison St. Charles, L.L.C. d/b/a Quality Inn Maison St. Charles
v.
The COUNCIL OF the CITY OF NEW ORLEANS and Entergy New Orleans, Inc.
Nos. 2008-C-0929, 2008-C-0932, 2008-OC-1226, 2008-OC-1240.
Supreme Court of Louisiana.
April 3, 2009.
Rehearing Denied May 29, 2009.
*65 Wilkerson & Henry, Walter Jefferson Wilkerson, New Orleans; Sonnenschein, Nath & Rosenthal, Clinton A. Vince, Orlando Vidal, Washington, DC, for Applicant (2008-C-0929 & 2008-OC-1226).
Gordon, Arata, McCollam, Duplantis & Eagan, Ewell Elton Eagan, Jr., Phillip Jay Antis, Jr., Wendy Hickok Robinson, New Orleans; Entergy Services, Inc., Margot Gallup Augustin, Alyssa A. Maurice, Kathryn J. Lichtenberg; Roedel, Parsons, Koch, Blache, Balhoff & McCollister, Jon Kenton Parsons, Luke Francis Piontek, Thomas John Capella; Murray, Darnell & Associates, Michael Charles Darnell, Edwin Rene Murray, New Orleans; Domengeaux, Wright, Roy & Edwards, Bob F. Wright, James Parkerson Roy, Lafayette; Barkley & Thompson, Walter C. Thompson, Jr., New Orleans, for Respondents (2008-c-0929 & 2008-OC-1226).
Gordon, Arata, McCollam, Duplantis & Eagan, Ewell Elton Eagan, Jr., Phillip Jay Antis, Jr., Wendy Hickok Robinson, New Orleans; Entergy Services, Inc., Margot Gallup Augustin, Alyssa A. Maurice, Kathryn J. Lichtenberg, for Applicant (2008-C-0932 & 2008-OC-1240).
Roedel, Parsons, Koch, Blache, Balhoff & McCollister, Jon Kenton Parsons, Luke Francis Piontek, Thomas John Capella; Murray, Darnell & Associates, Michael Charles Darnell, Edwin Rene Murray, New Orleans; Domengeaux, Wright, Roy & Edwards, Bob F. Wright, James Parkerson Roy, Lafayette; Wilkerson & Henry, Walter Jefferson Wilkerson, New Orleans; Barkley & Thompson, Walter C. Thompson, Jr., New Orleans, Sonnenschein, Nath & Rosenthal, Clinton A. Vince, Orlando Vidal, Washington, DC, for Respondent (2008-C-0932 & 2008-OC-1240).
VICTORY, J.
We granted and consolidated these writ applications primarily to determine whether the court of appeal erred in reversing an order of the Council of the City of New Orleans (the "Council") and directing Entergy New Orleans, Inc. ("ENO") to refund $34,300,000 to its ratepayers for charges related to System Fuels, Inc.("SFI") Period Costs which ENO had been collecting through its Fuel Adjustment Clause ("FAC") from 1985 through 2000. After reviewing the record and the applicable law, we reverse that portion of the court of appeal judgment because the Council's decision as ENO's regulator to allow ENO to pass SFI Period Costs through the FAC for that time period and not to require that ENO refund these costs to its customers was not arbitrary *66 and capricious and was reasonably based on the evidence presented.

FACTS AND PROCEDURAL HISTORY
ENO is an electric utility company engaged in the manufacture, generation, transmission, distribution, and sale at retail of electric power and energy to approximately 190,000 residential, commercial, industrial, and governmental customers located in that portion of New Orleans east of the Mississippi River.[1] ENO is a wholly owned subsidiary of Entergy Corporation ("Entergy").[2] On May 12, 1999, customers of ENO ("plaintiffs") filed a complaint with the Council against ENO, Entergy, ESI, and Entergy Power, Inc. ("EPI")[3] requesting that the Council institute an investigation to review ENO's FAC filings and the costs passed through to ENO's ratepayers, including, but not limited to, the propriety of the inclusion of certain costs in the FAC rather than in the base rate.[4]
FACs are "widely-accepted rate making tools utilized to allow a utility to recoup fluctuating fuel costs on an ongoing basis." Daily Advertiser v. Trans-La, a Div. of Atmos Energy Corp., 612 So.2d 7, 22 (La.1993). They are "a device to permit rates to adjust automatically, either up or down, in relation to fluctuations in certain, narrowly defined, operating expenses." Id. at 11 n. 1.[5] Regulators "employ *67 such clauses when they encounter an item of expense, such as fuel costs, that tends to be more volatile in comparison to the utility's other costs." Id. (Citing Southern California Edison Co. v. Public Utilities Com'n, 20 Cal.3d 813, 144 Cal. Rptr. 905, 576 P.2d 945 (1978)). The clause allows utilities to pass fluctuating fuel costs along to customers as the costs are incurred, without filing numerous base rate cases, and the customer's rate varies directly with the utility's fluctuating costs. Id.[6]
The charges complained of most relevant to this proceeding are SFI Period Costs. SFI is a corporate affiliate of ENO that has provided fuel-procurement and fuel-storage services to Entergy's affiliates, including ENO, since the 1970s. The "Period Costs" are non-fuel administrative costs incurred by SFI to provide the fuel procurement and fuel storage services to Entergy, and these costs are periodically allocated to members to the Entergy system, including ENO. ENO has passed these costs to its customers through its FAC since the 1970's. The plaintiffs claim that ENO ratepayers have been overcharged by approximately $26,000,000, plus interest, from 1985 through 2000, not because such costs were imprudently incurred, but because SFI Period Costs should have been included in ENO's base rates and not its FAC.
The regulatory proceeding before the Council that is the subject of these writ applications was initiated on August 19, 1999, when the Council issued Resolution No. R-99-525, opening Docket No. UD-99-2, and ordering an investigation and evidentiary hearing into matters raised by the plaintiffs in their complaint filed on May 12, 1999. For more than three years, the issues raised were the subject of extensive discovery and intensive review and analysis by the parties. From February 26, 2002, through March 15, 2002, an evidentiary hearing was conducted by Hearing Officer Jeffery S. Gulin, who compiled the evidentiary record upon which the Council relied in rendering its decision in this proceeding. Following the hearing, the parties filed post-hearing briefs, and proposed findings of fact and conclusions of law.
On February 5, 2004, the Council issued Resolution and Order No. R-04-66. In this 79-page Resolution and Order, the Council ordered a refund of approximately $7,200,000, plus $4,100,000 in interest, relating to certain costs which the Council found had been improperly flowed through ENO's FAC: (1) $3,957,925, plus interest, associated with excess costs from transactions related to EPI; (2) $1,831,404, plus interest, associated with "wrongful profits"; and (3) $1,414,098, plus interest, associated with capacity costs related to firm energy purchases. The Council rejected the plaintiffs' claims relating to SFI Period Costs, the use of a margin in making power purchase decisions, and other alleged "imprudent procurement practices." ENO complied with the Resolution and refunded $11,310,072 to its customers.
The plaintiffs appealed the Council's Resolution to the district court seeking additional refunds. On May 26, 2005, after briefing and oral argument, Judge Robin Giarrusso affirmed the Council's Resolution, finding that the evidence in the record supported the Council's decision not to award any refund based on the margin or the SFI Period Costs.
The plaintiffs then appealed this ruling to the Fourth Circuit Court of Appeal. On February 25, 2008, the Fourth Circuit issued a 157-page decision affirming in part *68 and amending in part the Council's Resolution and the trial court's judgment. Gordon v. Council of City of New Orleans, 05-1381 (La.App. 4 Cir. 2/25/08), 977 So.2d 212. The Fourth Circuit rejected three of the four assignments of error, finding that the Council did not act arbitrarily and capriciously when it dismissed the plaintiff's claims regarding SFI Period Costs (Assignment of Error No. 1), the Arkansas Electric Cooperative Corporation Adders[7] (Assignment of Error No. 2), or fraud (Assignment of Error No. 4). Regarding the SFI Period Costs, the Fourth Circuit devoted 64 pages analyzing the Council's role in setting rates, the parties' positions on SFI Period Costs, relevant legal authorities, expert testimony, and the testimony before the Council. The court then made several paragraphs of relevant findings on the SFI period costs, all supporting its conclusion that "we find that this assignment of error does not have merit, and conclude that the district court was also correct in affirming the Resolution of the City Council as to its findings in the administrative proceeding."[8]Id. at 277. However, the Fourth Circuit substantially *69 modified the Council's decision not to award any refund based on ENO's use of the margin.[9] With respect to plaintiffs' claim concerning the margin, the court discussed the issue for 32 pages and then reversed the Council's Resolution only as to the amount refunded, which had been $11,000,000 as to the margin. Id. at 297.[10] This modification to the refund amount was stated to be based on the court's apparent beliefs that the Council's refund, $11,000,000, was (1) disproportionate to a refund ordered as a result of a settlement with the Louisiana Public Service Commission ("LPSC") in another case, Delaney v. Entergy, Inc., $72,000,000, and (2) too low considering the refund amount the Council's own advisors had recommended, which the court stated was $34,300,000. Id. In reality, the $72,000,000 refund in Delaney had nothing to do with margins and the $34,300,000 recommended by the City Council advisors was actually for SFI Period Costs, not margins. After reviewing the opinion, both parties moved for a rehearing, with the plaintiffs requesting that the Fourth Circuit correct its "clerical error" and leave in place the refund amount, but change its justification for the refund from Assignment of Error Three to Assignment of Error One.
The court of appeal denied the defendants' rehearing application but granted that of the plaintiffs. On April 4, 2008, in an unreported "Order," the court of appeal changed nothing of the language of the entire opinion, including its lengthy discussion and reasoning regarding the SFI Period Costs or the margin, but changed the outcome regarding the SFI Period Costs and margin refunds by changing a few *70 words in the opinion. The Order states, in pertinent part:
I. With respect to this Court's 157 page decision in the above captioned matter, dated February 25, 2008:
a. This court amends its decision and concludes that Assignment of Error No. 1, does have merit as found by the City Council's Advisors with respect to SFI Period Costs. This Court holds that the district court was incorrect in affirming the City Council's rejection of the plaintiff's claims. Specifically, the Court amends its decision at page 114, top of page, first full sentence which currently reads:
Therefore, we find that this assignment of error does not have merit and conclude that the district court was also correct in affirming the Resolution of the City Council as to its findings in the administrative proceeding.
Is amended henceforth to read:
Therefore, this Court finds that this assignment of error does have merit, and conclude that the district court was incorrect in affirming the Resolution of the City Council as to its findings in the administrative proceeding, and award SFI Period Costs, as they are included in the City Council Advisors' recommendation, discussed in connection with Assignment of Error no. 3, below.
b. Specifically, the Court amends the first sentence of the first paragraph of its DECREE at page 156, which reads:
For the reasons above stated, we affirm the City Council's Resolution and the district court's judgment with respect to the Appellants' first, second, and fourth assignment of error, finding that there was no arbitrariness or capriciousness in the City Council's order and/or the district court judgment.
Is amended henceforth to read:
For the reasons above stated, we affirm the City Council's Resolution and the district court's judgment with respect to the Appellants' second, third, and fourth assignments of error, finding that there was no arbitrariness or capriciousness in the City Council's order and/or the district court judgment.
c. Finally, the Court amends the first sentence of the second paragraph of its DECREE at page 156, which reads:
As to the Appellants' third assignment of error concerning the City Council's resolution to order a refund to ratepayers for overcharges, we reverse on this issue only as to the amount ordered refunded, finding that the City Council's resolution was arbitrary and capricious.
Is amended to read:
As to the Appellants' first assignment of error concerning the City Council's resolution to order a refund to ratepayers for overcharges, we reverse on this issue only as to the amount ordered refunded, finding that the City Council's resolution was arbitrary and capricious.
II. With respect to this Court's holding that the full amount of refunds recommended by the City Council's advisors is ordered refunded to ENO's ratepayers, this Court amends its decision to expressly state that legal interest shall be added to the refund amount, less any legal interest paid on prior partial refunds ordered by the City Council.
a. The Court amends the [sic] its decision at page 157, to insert the following language immediately prior to the last sentence to henceforth read:
This Court's reference to the $34.3 million sum is not meant to exclude *71 the applicability of interest on the remainder of that sum still to be refunded (i.e., $34.3 million les [sic] the $11.3 million already refunded), which as a matter of law must be added, consistently with the initial partial refund ordered by the City Council as noted in footnote 8 of this decision.
(No cite available as unreported and achieved through an Order.)
Essentially, without altering the lengthy analysis concerning SFI Period Costs and its reasoning as to why no refund should be awarded for these costs, the Fourth Circuit changed its conclusion by changing the words "this assignment of error does not have merit" to "this assignment of error does have merit." The court also switched the $34,300,000 refund it ordered from assignment of error three (the margin), to assignment of error one (SFI Period Costs). Whether their ultimate conclusion on rehearing was error or not, it is exceedingly difficult to analyze that conclusion when their reasoning supports what appears to be the opposite conclusion.
In any event, ENO and the Council filed four writ applications in this Court. In 08-C-0929 and 08-C-0932, they allege that the court of appeal erred in ordering a $34,300,000 refund for SFI Period Costs. Almost simultaneously, ENO and the Council also filed petitions for "Suspensive Appeal and Judicial Review" with the court of appeal, seeking to appeal to this Court. On May 9, 2008, the court of appeal denied the petitions for appeal. From that order denying the appeal, ENO and the Council filed writ applications 08-OC-1226 and 08-OC-1240, arguing that because the jurisdiction of the court of appeal involves a utility regulatory matter, they should be entitled to appeal to this Court pursuant to La. Const. Art. IV, § 21. We granted and consolidated all four writ applications. Gordon v. Council of the City of New Orleans, 08-C-0929, 08-C-0932, 08-OC-1226, 08-OC-1240 (La.10/24/08), 8 So.3d 563, 564. We now determine that because we granted ENO and the Council's writ applications on the merits in 08-C-0929 and 08-C-0932, the issue raised in the other writ applications is moot and we now withdraw the writ grants as to 08-OC-1226 and 08-OC-1240 and deny those writ applications.

DISCUSSION
As authorized by the Louisiana Constitution and pursuant to the Home Rule Charter of the City of New Orleans, all legislative powers of the City are vested in the Council. La. Const. Art. 6, §§ 4-6 (1974), Home Rule Charter 3-101(1).[11] Among the legislative powers exclusively granted to the Council are the powers of "supervision, regulation, and control" over those utility companies that furnish services within the City of New Orleans. Home Rule Charter 3-130(1);[12]see also State ex rel. Guste v. Council of City of New Orleans, 309 So.2d 290, 293 (La.1975). *72 Rate making is included in the Council's exclusive regulatory powers over utility companies. Home Rule Charter 3-130(2).[13]
The standard of review of rate making determinations has been enumerated by this Court on numerous occasions, mainly concerning orders of the Louisiana Public Service Commission ("LPSC"). The LPSC has regulatory and rate making powers over all public utilities in this state, except those operating in New Orleans and governed by the Council. This Court has held that an order of the LPSC should not be overturned unless it is arbitrary and capricious, a clear abuse of authority, or not reasonably based upon the factual evidence presented. Entergy Louisiana, LLC v. Louisiana Public Service Com'n, 08-0284 (La.7/1/08), 990 So.2d 716, 723 (citing Entergy Gulf States, Inc. v. Louisiana Public Service Com'n, 00-0336 (La.8/31/00), 766 So.2d 521, 525; Entergy Louisiana, Inc. v. Louisiana Public Service Com'n, 98-0475 (La.9/9/98), 717 So.2d 217, 218). The function of the reviewing court is not to re-evaluate and re-weigh the evidence, or to substitute its judgment for that of the LPSC. Id. (citing Washington-St. Tammany Elec. Co-op., Inc. v. Louisiana Public Service Com'n, 95-1932 (La.4/8/96), 671 So.2d 908). The LPSC is entitled to deference in its interpretation of its own rules and regulations, though not in its interpretations of statutes and judicial decisions. Id. (citing Alma Plantation v. Louisiana Public Service Com'n, 96-1423 (La.1/14/97), 685 So.2d 107, 110). The LPSC's interpretation and application of its own orders deserve great weight because the LPSC is in the best position to apply them. Id. (citing Dixie Elec. Membership Corp. v. Louisiana Public Service Com'n, 441 So.2d 1208, 1211 (La.1983)).
Just as the LPSC has exclusive statewide regulatory and rate making powers over public utilities, the Council has exclusive regulatory and rate making authority over public utilities in New Orleans. This Court has stated that the proper standard of review over the Council's decisions in this regard is the arbitrary and capricious standard. Alliance For Affordable Energy v. Council of City of New Orleans, 96-0700 (La.7/2/96), 677 So.2d 424, 434. Regarding the regulatory and rate making authority of the Council, we have held that "[r]ecognition of that authority requires that we limit our review to a determination of whether [the decision] is reasonable and refrain from merely substituting our judgment for that of the Council." State ex rel. Guste, supra at 294. As both the LPSC and the Council are regulators of public utilities and experts in their knowledge of that field, we apply the same standard of review to the Council as we do to the LPSC.
*73 This Court has explained the "public utility concept" underlying governmental regulatory authority over public utilities as follows:
Fundamentally, two characteristics of operation peculiar to those enterprises that supply continuous utility services through permanent physical connections between the plant of the supplier and the premises of the consumer (i.e., public utilities) require their public regulation: (1) the economic necessity of the services to the community, and (2) the severely localized and restricted market for utility services (so limited because of the necessarily close physical connection between the utility plant on the one hand and the consumers' premises on the other) that, combined with the economies of a large-scale enterprise, requires monopoly status to service (i.e., competition within such a limited market would substantially increase the costs of services and/or bankrupt the rivals). See J. Bonbright, Principles of Public Utility Rates 7-17 (1961). Thus, in exchange for their favored status, furnishers of utility services submit to public regulation, which generally sanctions utility rates that provide a limited but reasonable return on the investment of the public utility. In effect, the public regulation acts as a substitute for competition. Id.

State ex rel. Guste, supra at 292.
In utility rate making, the primary objective is to allow the company sufficient revenues to meet its operating expenses, provide its shareholders with a reasonable rate of return, and attract new capital. Central Louisiana Elec. Co. v. Louisiana Public Service Com'n, 508 So.2d 1361, 1364 (La.1987); South Central Bell Tel. Co. v. Louisiana Public Service Com'n, 352 So.2d 964, 967 (La.1977). The rate making process involves a complicated set of factors under which the regulator approves base rate increases or requires base rate decreases. Base rates should allow the utility the opportunity to recover prudently incurred operating and maintenance expenses, taxes, and a fair return on investment that is used and useful in providing utility services. Base rates may not change except as a result of a base rate proceedings. (See Central Louisiana Elec. Co., supra at 1364-1371 for a full explanation of the rate making process.)
As stated earlier, FACs "are widely accepted rate making tools." Daily Advertiser, supra at 22. "The commission's allowance of monthly cost adjustments pursuant to such clauses does not constitute rate making in the traditional sense of that term because such adjustments go into effect without an antecedent reasonableness review and thus are not `commission-made' rates." Id. They are unlike commission-made rates, or base rates, "which are implemented subsequent to an exhaustive evidentiary presentation of the utility's expenses and their reasonableness." Id. at n. 26 (citing Equitable Gas Co. v. Pennsylvania Public Utility Com'n, 106 Pa.Cmwlth. 240, 526 A.2d 823, 830, appeal denied, 516 Pa. 644, 533 A.2d 714 (1987)). "The distinction between rates implemented pursuant to automatic fuel adjustment clauses and `commission-made' rates is that while the latter are the result of a full-fledged rate proceeding in which the reasonableness of all the utility's costs are reviewed, the former are implemented automatically with no antecedent reasonableness review." Id. "Such clauses are generally adopted in a rate proceeding as an integral part of a utility's overall rate structure." Id. (citing Scates v. Arizona Corp. Com'n, 118 Ariz. 531, 578 P.2d 612, 616 (1978); Public Service Co. of New Hampshire v. Federal Energy Regulatory Com'n, 600 F.2d 944, 947 (D.C.Cir.), cert. *74 denied, 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979)).[14]
FACs are not designed to allow the utility to earn a profit, but are instead designed to permit a dollar-for-dollar recovery in fuel costs. Id. at 24 (cites omitted). The customer is only harmed by the implementation of such clauses if such clauses are "manipulated or abused." Id. Any person who believes the rates to be unreasonable may file a complaint with the regulator, in this case, the Council, Id. The regulator retains jurisdiction to review and determine whether costs passed on through such clauses are just and reasonable and thus prudently incurred by the utility. Id. The regulator's "ongoing authority to investigate fuel cost adjustments passed on through such clauses includes the power, when necessary, to take corrective measures and to order refunds for charges not prudently incurred ..." Id. at 25 (cites omitted). The regulator "has the power to review these filings to determine if overcharges were made, and, if appropriate, to order refunds or fashion other appropriate remedies." Id. at 30. Accordingly, the Council must determine whether the costs included in the FAC are reasonable and properly included in the FAC, and if they are found not to be, the Council has the power to order refunds or fashion other appropriate remedies. Here, the determination focuses on whether the SFI Period Costs were properly passed through the FAC, as no party disputes that the charges were prudently incurred.
The Council made the following findings with respect to the SFI Period Costs in this case:
SFI Period Costs are non-fuel administrative costs incurred by SFI to provide fuel procurement and fuel storage services to Entergy which are then allocated to certain Operating Companies pursuant to an SEC-approved procedure. Those costs are presently recovered by ENO through its FAC, and have been recovered in this manner since the 1970's.
Plaintiffs, Intervenors and Council Advisors claim that ENO ratepayers have been overcharged by approximately $26 million, plus compound interest, from 1985 through 2000, not because such costs were imprudently incurred, but because SFI Period Costs should have been in ENO's base rates and not its FAC. All parties in this Docket argue that no Council resolution explicitly allows the recovery of SFI Period Costs through the FAC. Council Advisors' witness Walsh contends that Council Ordinance No. 10663 does explicitly state which fuel expense accounts (FERC accounts 501, 518, 547 and 555) should be recovered through the FAC. Further, Witness Walsh notes that the FERC determined in an audit concluding in 1997 that SFI Period Cost expenses should not be included in FERC account 501, but rather in other specific accounts and thus not charged through the wholesale FAC.
ENO argues that SFI Period Costs have been properly recovered through the FAC because (i) rate case treatment of those costs in the 1974-75 ENO rate case resulted in their having the status of a filed rate; (ii) rate case treatment of *75 those costs since the Council regained jurisdiction over ENO from the LPSC in 1985 resulted in their having the status of filed rates; (iii) repeated independent audits of ENO's FAC focused on the method of recovery of SFI Period Costs, and those audits were furnished to the Council, but the Council elected not to change the method of recovery from FAC to base rates; (iv) no party, including the Plaintiffs and Intervenors, has challenged the prudence of those costs; and (v) the LPSC, when confronted with this issue in the Delaney proceedings, did not order a refund. ENO maintains that, in its 1997 General Order on fuel clause components, the LPSC ordered that SFI Period Costs should be moved into ELI's base rates prospectively only, on a revenue-neutral basis, and that no disallowances were ordered of prior incurred SFI Period Costs, and ELI was allowed to receive 100% of its future SFI Period Costs in base rates. In LPSC Docket No. U-21497, the LPSC conducted a generic investigation regarding the FACs of jurisdictional electric utilities. On November 6, 1997, the LPSC issued its General Order No. U-21497 (the "General Order"), revising the format in which FAC filings are to be made, providing for the realignment of certain costs, including SFI Period Costs, from FAC recovery to base rates, and establishing certain reporting and other requirements relating to LPSC jurisdictional FACs. The guidelines established in General Order No. U-21497 for the realignment of costs from a utility's FAC to its base rates apply prospectively only, as evidenced by the LPSC's provision that such costs are to be realigned on a revenue-neutral basis. Costs can be realigned on a revenue-neutral basis only if recovery through base rates is commenced at the same time such costs are removed from the FAC calculation. The fact that the LPSC ordered a prospective realignment of costs did not, in and of itself, indicate that any realigned costs had been improperly recovered through the FAC in prior periods, and the General Order did not establish that any particular cost component was improperly included in FAC filings prior to the revenue-neutral realignment prescribed by the General Order.
Although testimony has been introduced in this proceeding by the Plaintiffs, Intervenors and the Advisors to the effect that SFI Period Costs should not be included in ENO's FAC, we find, as a matter of equity, that no retroactive refund for SFI Period Costs should be made.
The Council notes that, while independent audits of the fuel clause were conducted as well by the Department of Utilities, there is no evidence that such FAC audits were ever the subject of extensive review by the Council, and any inaction with respect thereto by the Council cannot be deemed to be concurrence with any action or inaction on the part of ENO. However, the Council finds that the ratepayers were not harmed by ENO's inclusion of SFI Period Costs in the FAC. First, no party challenged the prudence of the SFI Period Costs, and thus the Council is required to allow ENO the opportunity to recover those costs in either the FAC or base rates. Second, ENO does not earn a return on the recovery of SFI Period Costs through its FAC where it would if such costs were recovered through base rates. Because the level of the SFI Period Costs have declined over time, and because of the "regulatory lag" involved in base rate proceedings, the ratepayers might have paid more than *76 they did if those costs had been included in base rates rather than in the FAC. The Council takes notice both of the action the LPSC took in this regard and of the action the Council itself took with respect to ELI's rates in Algiers (including SFI Period Costs, for which the Council ordered no refund), in Resolution R-00-799. However, the real violation at issue here is ENO's action to recoup these charges via the FAC without prior authorization. As part of Settlement in Docket No. UD-01-04, ENO proposed, and the Council authorized prospectively, ENO's recovery of SFI's period costs through the FAC. ENO's rate case was the appropriate forum for resolution of this issue and no further action by the Council is required.
No credible facts were introduced to support a claim that the inclusion of the SFI Period Costs in ENO's FAC filings was (i) the result of any intention to harm or deceive ENO's ratepayers; (ii) the result of any manipulation or abuse of the FAC to the detriment of ENO's ratepayers; or (iii) the result of any agreement between ENO and any of its affiliates to harm the ratepayers; or (iv) fraudulent.[15]
Thus, the Council determined not to order a refund for SFI Period Costs based on the following reasons: SFI Period Costs have been recovered through ENO's FAC since the 1970s, and no party had challenged this method of recovery; LPSC General Order No. U-21497 did not disclose whether SFI Period Costs had been improperly recovered through the FAC in prior periods and only ordered them realigned into base rates on a prospective basis, with no refund ordered; when actually presented with the issue in a separate rate case the Council permitted the prospective recovery of SFI Period Costs through ENO's FAC; although the LPSC had realigned SFI Period Costs from the FAC into base rates prospectively and on a revenue-neutral basis prior to the Delaney case, the LPSC in Delaney had ordered no refunds for prior periods; the costs were prudently incurred; ENO did not pass them on to ratepayers with an intent to harm, deceive, or defraud them; ratepayers were not harmed; ENO did not earn a return on the recovery of SFI Period Costs through its FAC as it would have if such costs were recovered through base rates; and because SFI Period Costs have declined over time, ratepayers likely benefitted by ENO's inclusion of them in its FAC.
After reviewing the evidence in the record, we find that there is sufficient evidence to support the Council's finding that no refund should be ordered for SFI Period Costs in this case. First, the evidence shows that ENO has been including SFI Period Costs in its FACs since the 1970s, a fact well known by the Council. In 1974, ENO requested a base rate increase to reflect rising fuel costs. In that proceeding, the issue of the effect of including SFI Period Costs in the FAC or the base rates was addressed. As a result, on November 5, 1975, the Council adopted Resolution No. 75-178, which allowed ENO to continue its recovery of SFI Period Costs through the FAC. Bruce Louiselle, an expert hired by ENO, testified that in Council Resolution 75-150, a specific *77 request was made to transfer the recovery of SFI Period Costs from the FAC to base rates and the Council did not approve that request. Louiselle also testified that in Council Resolutions R-85-526, R-85-635, and R-86-92, the Council ordered ENO to freeze its FAC at rates that included the recovery of SFI Period Costs.
George Panzeca, a former city auditor with Price Waterhouse and Ernst & Young, testified that there were seven audits of ENO between 1980 and 1997. He asserted that the Council was aware of the fact that SFI Period Costs were recovered via the fuel adjustment charge since at least 1974, and that the FAC charged was disclosed in its monthly FAC filings to the Council. Specifically, in 1981, 1986, 1988, and 1994, the auditors hired by the City questioned whether SFI Period Costs should properly continue to be included in the FAC and recommended that the Council consider the appropriateness of this practice. However, the Council never ordered any realignment of SFI Period Costs into base rates. In his opinion, refunds of the SFI Period Costs would conflict with the regulatory history of the handling this matter. The Council found in the instant Resolution regarding the audits that they were not subject to extensive review by the Council and that any inaction on the part of the Council cannot be deemed to constitute concurrence with ENO's actions or inactions. Thus, it can fairly be said that the Council was aware of ENO's practices regarding SFI Period Costs and chose not to take the advice of the auditors regarding those costs, but that does not mean that they necessarily concurred in this practice.
The Council noted the prior action it had taken regarding SFI Period Costs in R-00-799 regarding ELI's rates in Algiers.[16] In R-00-799, ELI had voluntarily requested a base rate decrease pursuant to which SFI Period Costs would remain in the FAC. The Council approved this base rate decrease.[17]
In the LPSC's General Order No. U-21497, the LPSC conducted a general investigation into the FACs for utilities within its jurisdiction which was initiated to investigate the computation of the FAC of EGS, an ENO affiliate. The General Order "was designed to address the issue of which costs should and should not be recovered through the [FAC] and to standardize various reporting and review requirements," as there were no clear guidelines on that issue. The LPSC recognized the "apparent trend of utilities recovering non-fuel related costs through its FAC" and stated that this was "problematic" because these costs are then subject to less scrutiny and result in the utility "effectively grant[ing] themselves single issue rate increases when those costs may have been offset by other savings or expense reductions for costs reflected in base rates."[18] The General Order included a *78 list of the types of costs that could be included in LPSC jurisdictional FAC filings[19] and the types of costs that were *79 excluded.[20] Special exceptions could be made with the approval of the Commission. The General Order contained specific reporting and filing requirements going forward and for audits every other year. The General Order did not specify whether period costs were includable or excludable costs. As a result of the General Order, any costs that had been incorrectly included under FACs would be realigned prospectively, on a revenue neutral basis. The LPSC Staff noted that the action of ordering the realignment of costs did not, in an of itself, imply that any realigned costs had been improperly received through the FAC in prior periods.
Subsequently, in LPSC Docket No. U-23626, ELI requested to have certain fuel costs, including SFI Period Costs, realigned pursuant to General Order No. U-21497, from its FAC to a separate base rate rider applicable to all of ELI's electric rate schedules effective January 1, 1998. This realignment was approved and implemented prospectively, on a revenue neutral basis, as contemplated by General Order U-21497. In neither U-21497 nor U-23626 did the LPSC order a retroactive refund of SFI Period Costs that had been included in the companies' FACs.
The Council, and both lower courts, relied on Delaney v. Entergy Louisiana, Inc. and Entergy Corp., Docket No. 23356, a very similar case in which a settlement was reached. In that case, the plaintiffs filed a petition asking that the LPSC investigate costs flowed through ELI's FAC, including SFI Period Costs. The LPSC stated that it had sanctioned the recovery of SFI Period Costs through ELI's FAC in numerous base rate proceedings, as well as in ELI's monthly FAC hearings prior to 1991. In addition, the LPSC stated that SFI Period Costs were prudently incurred, and until these costs were realigned pursuant to LPSC General Order No. U-21497, they were properly included in ELI's FAC filings. Accordingly, the LPSC concluded that a refund of SFI Period Costs was not warranted because ratepayers were not harmed by the inclusion of these costs in the FAC, ordering a refund would deny ELI all recovery of SFI Period Costs even though there was no evidence they were imprudently incurred, and there was no evidence of fraud or intent to deceive. The LPSC decided to prospectively require ELI to pass SFI Period Costs through its base rates rather than the FAC, but did not order a refund of any SFI Period Costs passed through the FAC in prior years. The settlement in Delaney did result in a $72,000,000 refund to ratepayers, but this refund did not involve SFI Period Costs.
The Council also found that the SFI Period Costs were prudently incurred, which no party seems to dispute, that there was no intent to deceive, and that the ratepayers were not harmed. Evidence *80 in the record supports that fuel prices were declining.
The Plaintiffs take issue with respect to the Council's findings on several grounds. Indeed, the Council's own advisor, Kenneth Walsh opined that the Council should order a refund for SFI Period Costs,[21] concluding as follows:
Clearly, ENO has not adhered to Council Resolution Nos. R-76-135, and R-76-179 regarding the proper treatment of SFI period costs in that these costs are non-fuel related fixed expenses that should not be recovered through the fuel adjustment clause. In addition, a 1991 audit conducted by Ernst & Young clearly indicates the proper treatment of SFI period costs. Most telling is that ENO has continued, despite FERC's explicit recommendation to the contrary, to report its SFI period costs in FERC Account 501 and therefore subsequently has and continues to flow through these costs in its monthly fuel adjustment filings. The ultimate impact on ENO ratepayers is the ability of ENO to recover SFI period fixed costs via its fuel adjustment in lieu of base rates. Furthermore, such costs should not be recoverable during a period when base rates are frozen as reflected in the settlement terms of its last rate case before the Council pursuant to Council Resolution No. R-98-721. Therefore, it is my belief that ENO has improperly collected approximately $25.75 million, adjusted for interest computed at applicable prime rates, of SFI period costs through its fuel adjustment filings for the period April, 1985 through December, 1999....
Regarding the evidence relied on by Walsh, we note the following. Council Resolution Nos. R-76-135 and R-76-179 did not specifically discuss SFI Period Costs. Instead, they provided a formula for the FAC based on the average fossil fuel cost and revised NOPSI's current FAC to provide a correction factor to be included in the FAC to take into account any over or under collection of fuel costs which would result in the company recovering its exact costs.[22] We do not interpret the fact that these two resolutions referred only to "fossil fuel" and not to any other non-fuel costs as establishing that the Council was mandating at that time that only fuel costs could be included in the FAC.
Regarding the audit, dated September 30, 1991, the accounting firm stated:
Although excluding these charges would not decrease monthly electric fuel adjustment charges by an appreciable amount, the relatively fixed and predictable nature of this non-fuel expense makes recovery through electric base *81 rates more appropriate. Such a change in the manner in which SFI period costs are recovered should be considered in the context of NOPSI's next application for rate relief.
However, as stated earlier, the Council did not make any adjustments to ENO's FAC based on this recommendation, as is their prerogative. Further, the audit was not a mandate, but more a suggestion that the Council consider making such a change.
Regarding the FERC recommendations, the record shows that from an audit of ENO's records from January 1, 1990 through December 31, 1993, the FERC issued findings and recommendations in Docket No. FA-17-000. There, the FERC found that ENO was incorrectly including SFI Period Costs in Account 501 relating to fuel (and hence the FAC) and recommended that ENO adopt the necessary procedures to properly classify these expenses. ENO responded in 1997 that it was evaluating whether to continue using SFI to provide oil storage services and until such time as that was decided it would continue to use its present accounting practices. In FERC Opinion No. 366, in which the FERC ordered that an ENO affiliate realign SFI Period Costs into base rates, the FERC ordered a refund of the difference between what SFI Period Costs would have been recovered had they been in base rates. In the case sub judice, the Council found that there would not have been a significant difference if the costs had been included in base rates. Further, Walsh admitted that the FERC, which regulates whole electricity rates, had no regulatory control over ENO.
The plaintiffs also rely on an internal Entergy memo to show that Entergy intended to manipulate the FAC to wrongly include SFI Period Costs. A 1987 internal Entergy report states:
LP & L and NOPSI, which are allocated about two thirds of the fuel oil and period costs, collect monies to pay these SFI period costs through their fuel adjustment clauses (just like they collect the actual costs of fuel oil). It is unclear how LP & L and NOPSI would collect these costs if fuel oil responsibility was placed outside of SFI ... Any change in the System's method of procuring fuel oil through SFI will have significant economic implications. A change could draw attention to how the operating companies collect fuel oil and period costs. Thus, the potential exists that the collection of these period costs will be reduced by as much as the full $17-18 million. Any reduction would be reflected as System cash flow and net income decreases.
While the Council quoted this memo in its Resolution in this case, the Council evidently did not believe it supported the plaintiffs' position. The record shows that whatever the author of this memo believed, the Council already knew ENO was passing these costs through the FAC.
Finally, plaintiffs and Walsh relied heavily on the fact that ENO had agreed to a base rate freeze during some of the years in which ENO was passing SFI Period Costs through its FAC. The record reveals that ENO was under a base rate freeze from March 20, 1986-January 1, 1998, September 5, 1991-November 1, 1996, and November 5, 1998-October 1, 2001. Another regulator, the LPSC, has found that passing unauthorized costs through the FAC during a base rate freeze is grounds for ordering a refund. Entergy Gulf States, Inc., infra at 890-91. However, in this case the Council did not find that the SFI Period Costs should have been included in the base rates. That alleviated the need for the Council to consider whether ENO was circumventing the base rate freeze.
*82 The plaintiffs argue that the Council did find that the SFI Period costs should have been included in the base rates, relying on the Council's statement that "the real violation at issue here is ENO's action to recoup these charges via the FAC without prior Council authorization." They argue that this constitutes a finding that the Council found that ENO had violated its rules and regulations by passing the SFI Period Costs through the FAC. Therefore, they argue, the Council is required to order ENO to refund these SFI Period Costs. We disagree.
First of all, a finding that ENO committed a "violation" by failing to get prior Council authorization is not a finding that the SFI Period Costs were improperly passed through the FAC. Significantly, not only did the Council refuse to order a refund, its also did not order ENO to realign these costs prospectively into the base rates. In fact, all parties state that to this day, ENO is passing SFI Period Costs through the FAC. While other regulators have found that SFI Period Costs should be included in the base rates, the Council in this case has not reached the same conclusion. The Council has sole regulatory authority over ENO and is authorized by the Home Rule Charter to make this determination, even if some of the costs included in the SFI Period Costs are not technically fuel costs. No party disputes that ENO is entitled to recover SFI Period Costs; evidently the Council has determined that the ratepayers and ENO are better served if ENO collects them through the FAC. The Council as regulator of utility rates "is an expert within its own specialized field and its interpretation and application of its own [rules and regulations] ... deserve great weight, because the [Council] is in the best position to apply its own [rules and regulations]." Dixie Elec. Membership Corp., supra at 1210 (citing Central Louisiana Elec. Co., supra).
Further, even if the Council had found that ENO violated its rules and regulations by passing the SFI Period Costs through the FAC, they would not be obligated to order a refund. In Daily Advertiser, this Court recognized the dangers involved when utility companies attempt to manipulate FACs by passing unallowable costs through them and held that the regulator "has the power to review [FAC] filings to determine if overcharges were made, and, if appropriate, to order refunds or fashion other appropriate remedies." Although the LPSC ordered a refund in that case which this Court affirmed, contrary to the plaintiffs' argument, that case does not mandate that a refund be ordered any time a violation is found.
In addition, while refunds have been ordered in other cases involving charges passed through a utility's FAC, that does not mean a refund is required here. In Gulf States Utilities Co. v. Louisiana Public Service Com'n, 96-2046 (La.2/25/97), 689 So.2d 1337, the LPSC ordered a "retroactive disallowance," i.e., a refund, of $5,200,000 that Gulf States, an ENO affiliate, wrongly double-charged its customers through its FAC, and this Court approved that refund, finding that it did not constitute "retroactive rate-making." This case is distinguishable because the regulator, in its discretion, ordered a refund, and the costs refunded were found to be imprudent because they amounted to a double-charge. In Entergy Gulf States, Inc. v. Louisiana Public Service Com'n, 98-0881 (La.1/20/99), 726 So.2d 870, the LPSC ordered a refund for gas storage charges at an ENO affiliated company that were passed through the FAC, finding that these "carrying charges" were predictable, known or measurable costs which should have been included in the base rates. The *83 LPSC also ordered a refund for the cost of electricity supplied to two affiliated companies that were passed through the FAC, finding they were operational costs that should have been included in base rates. The LPSC found this particularly objectionable because it occurred during a base rate freeze, which effectively allowed the company to circumvent the base rate freeze. 726 So.2d at 890-91. This Court affirmed the LPSC's order, stressing that the LPSC's decisions are entitled to great weight and will not be disturbed unless shown to be arbitrary and capricious. Id. at 891. Finding a reasonable basis in the record to support the LPSC's conclusions and no error of law, this Court affirmed. Id. Again, that case is distinguishable because in this case, the regulator in its discretion did not order a refund, obviously because of the long history of ENO's practice, the Council's prior treatment of this practice, and the LPSC's refusal to order a refund in several prior cases. Finally, with regard to the base rate freeze, it may have been that ENO's agreement to a base rate freeze in three instances would not have occurred had they believed that the Council would not allow them to include SFI Period Costs in the FAC.
Lastly, we reject the plaintiffs' argument that the Council's decision was arbitrary and capricious because the Council did not follow the recommendation of its own advisors, who had recommended that the Council order a refund for SFI Period Costs. In Eagle Water, Inc. v. Louisiana Public Service Com'n, we held that "[a] regulatory body such as the [LPSC] is entitled to use its own judgment in evaluating evidence concerning a matter within its area of expertise, and is not bound even by uncontradicted opinion testimony of experts," even its own "staff's expert opinion." 06-1899 (La.1/17/07), 947 So.2d 28, 34 (cites omitted). In that case, we did point out that "if the [LPSC] chooses to act in this manner, the record evidence must nonetheless exist to support its decision." Id. As discussed throughout this opinion, the evidence supported the Council's decision.

CONCLUSION
The Council has regulatory and rate making authority over public utilities operating within its jurisdiction, including ENO. The decision of whether or not to allow a utility to include certain costs within its FAC is an exercise of the Council's regulatory and rate making authority. In this case, the Council allowed SFI Period Costs, which include costs that are not technically fuel costs, to be passed through ENO's FAC based on the history of the Council's treatment of ENO's longstanding practice regarding SFI Period Costs, the LPSC's refusal to order refunds to customers in other similar cases where public utilities within its jurisdiction passed SFI Period Costs through their FACs, and the Council's findings that ENO's customers were not harmed by this practice and ENO was not attempting to harm or deceive its ratepayers. While the Council's discretion over this issue is not unlimited, the Council's decision will not be overturned unless it is found to be arbitrary and capricious, a clear abuse of authority, or not reasonably based on the factual evidence presented. Because we find that the Council's refusal to order a refund for SFI Period Costs passed through ENO's FAC from 1985-2000 was neither arbitrary and capricious nor an abuse of authority, and was reasonably based on the evidence presented, the court of appeal erred in overturning the Council's Resolution and Order regarding SFI Period Costs.

DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed in *84 part and the judgment of the trial court is reinstated.
REVERSED IN PART; TRIAL COURT JUDGMENT REINSTATED.
JOHNSON, J., dissents and assigns reasons.
JOHNSON, J., dissenting.
I respectfully dissent. Contrary to the majority's opinion, I have concluded that the decision of the Council of the City of New Orleans ("Council") to allow Entergy New Orleans ("ENO") to pass System Fuels, Inc.'s ("SFI") Period Costs through its fuel adjustment clause from 1985 through 2000, and not require ENO to refund these costs to its customers, was arbitrary and capricious. In my view, the record supports a finding that passing the SFI Period Costs through the fuel adjustment clause was improper, that ENO knew that this practice was improper, and that these costs, because of their character, should have been included in ENO's base rate.
SFI is a subsidiary of Entergy. SFI owns and leases oil storage facilities and transportation equipment and purchases fuel oil for ENO to use in its generating stations. In addition to charging ENO for the actual costs of the oil delivered, SFI charges "Period Costs," which are not direct costs of fuel and are not generation dependent. Period Costs are administrative costs such as operating costs, depreciation and amortization of annual charges for the costs associated with depreciable assets owned by SFI, interest costs, and taxes other than income taxes (such as property taxes). These costs were incurred by SFI, charged to ENO, and passed on by ENO to its ratepayers through its fuel adjustment clause.
In Daily Advertiser v. Trans-La, 612 So.2d 7 (La.1993), this Court extensively explained the nature and purpose of fuel adjustment clauses:
An automatic fuel adjustment clause is a device to permit rates to adjust automatically, either up or down, in relation to fluctuations in certain, narrowly defined, operating expenses. Such clauses usually embody a formula established during a rate hearing to permit adjustment of rates in the future to reflect changes in specific operating costs, such as the wholesale cost of gas or electricity. Simply put, such clauses permit utilities to pass through to their customers fuel costs as they are incurred, and thus the amount the customer pays for the utility service varies directly with the amount the utility spends to produce the service.
Daily Advertiser, 612 So.2d at 11, n. 1 (internal citations omitted)
This Court noted that "[a]utomatic fuel adjustment clauses are widely-accepted rate making tools utilized to allow a utility to recoup fluctuating fuel costs on an ongoing basis." Id. at 22. We further noted that "[c]ommissions employ such clauses when they encounter an item of expense, such as fuel costs, that tends to be more volatile in comparison to the utility's other costs," and that "[s]uch clauses permit fluctuations in the utility's costs to be passed through directly to its customers as cost adjustments in subsequent utility bills." Id.
In distinguishing these rates from typical "commission-made" rates, we explained that:
"Commission-made" rates are those rates which are implemented subsequent to an exhaustive evidentiary presentation of the utility's expenses and their reasonableness. The distinction between rates implemented pursuant to automatic fuel adjustment clauses and "commission-made" rates is that while the latter are the result of a full-fledged *85 rate proceeding in which the reasonableness of all the utility's costs are reviewed, the former are implemented automatically with no antecedent reasonableness review.
Id. at 23 n. 26 (internal citations omitted).
Moreover, we explained that "fuel adjustment clauses are not designed to allow the utility to earn a profit; rather, they are recoupment devices designed to permit a dollar-for-dollar recovery of fluctuations in fuel costs." Id. at 24 (internal citations omitted).
This Court further found that "automatic fuel adjustment clauses are an integral part of the rate making process, are subject to ongoing commission regulation, and can be adjusted retroactively by the commission to require the utility to refund overcharges to its customers." Id. at 26.
Base rates were explained by this Court in Entergy Gulf States, Inc. v. Louisiana Public Service Commission, XXXX-XXXX (La.1/20/99), 726 So.2d 870:
Base rates consist of the predictable costs that are known and measurable, such as capital expenditures, which should only be considered in a base rate proceeding in which the Commission examines the value of the asset, considers a depreciation expense recoverable over the life of the asset, and adjusts the base rate of electricity to reflect the capital outlay for that project, and any other capital expenses, such as financing costs, etc. of regulatory assets. The Commission then approves or disapproves the rate increase/decrease based on its evaluation of the Company's expenses.
Entergy Gulf States, 726 So.2d at 873.
Because of the nature of the SFI Period Costs, they should have been included in ENO's base rate, rather than passed to ratepayers through ENO's fuel adjustment clause. At the administrative trial of this matter, numerous experts testified regarding the SFI Period Costs. All experts, other than ENO's own experts, concluded that ENO improperly included the SFI Period Costs in its fuel adjustment clause, and all recommended that these improperly billed costs be refunded to the ratepayers.
Robert Janssen testified on behalf of the plaintiffs.[1] Mr. Janssen testified that SFI, a subsidiary of ENO, was "established in 1972 to purchase, finance, and store oil for the Entergy utilities, and that these utilities, including ENO, pay for the costs to operate SFI." These costs are designated in the record as "Period Costs."
Mr. Janssen opined that these SFI Period Costs were improperly included in ENO's fuel adjustment clause because they are non-fuel base rate type overhead costs. In addition, ENO failed to get explicit approval from the City Council to include these costs in its fuel adjustment clause. Although ENO had been expressly informed that SFI Period Costs were not fuel costs appropriate to include in the fuel adjustment clause,[2] ENO continued to *86 include them in their billings, even during years when ENO was under a base rate freeze.[3] He testified that the amount of these overcharges, due to improper inclusion, was approximately $26.7 million dollars for the period June 1985 to June 2001. Of the $26.7 million dollars, $14.1 million dollars were improperly included in Entergy's fuel adjustment clause during a base rate freeze. He recommended that the Council refund these charges.
In making his recommendation, Janssen relied on Council resolutions and the general principles and guidelines found in proceedings before the Federal Energy Regulatory Commission ("FERC") and the Louisiana Public Service Commission ("LPSC"). He testified that ENO never received City Council approval to include Period Costs in its fuel adjustment clause, and, according to the principles developed by the FERC and the LPSC for reviewing fuel adjustment clauses, explicit approval of these Period Costs for collection through ENO's fuel adjustment clause, or explicit approval of the fuel adjustment clause itself, is required before the fuel adjustment clause rate can be deemed finally proved.[4] Janssen also testified that, *88 based on General Order in Docket No. U-21497, it is clear that the LPSC considers, as a general principle, that any costs other than direct fuel generation dependent costs must not be included in fuel adjustment clauses of electric utilities in Louisiana under its jurisdiction.[5]
Janssen further opined that it was irrelevant whether the charges were prudent or not. He testified that even if prudently incurred, improperly including SFI Period Costs in a fuel adjustment clause circumvents the Council's authority in numerous ways: improper inclusion of these costs during a base rate freeze allows a utility to recover costs that it would not have otherwise been able to recover since it could not request a base rate increase;[6] allows a utility to depreciate assets over a shorter time period that would be required in its base rates, which causes current customers to pay more for a utility's assets than they should;[7] allows a utility to avoid the cost recovery lag that is inherent in rate base processing, and thus the utility over-recovers its costs; prevents the council from reviewing the utility's recovery of the cost concurrently with all other similar costs, which thwarts the Council's ability to evaluate other rate-making issues that could potentially offset the cost effect of the improperly included costs; tends to undermine utility incentives to bargain vigorously, may promote inefficient conduct, and may lead to cost misallocations and could permit a utility to over recover its costs.
Janssen further testified that, according to one of its own internal reports in 1987, Entergy personnel were concerned that if the Council's attention was drawn to ENO's recovery of Period Costs through its fuel adjustment clause, it would no longer be able to recover these costs.[8] He *89 testified that it was clear that ENO has known since that time that Period Costs were improperly included in ENO's fuel adjustment clause and that this inclusion would not withstand Council scrutiny.
Kennan Walsh testified as the expert for the Council's advisers.[9] Mr. Walsh testified that there was an improper inclusion of SFI Period Costs in ENO's fuel adjustment clause filings after April, 1985, and that the effect of including non-fuel, fixed SFI Period Costs in its fuel adjustment clause resulted in the over-collection of nearly $25,750,000.00. For the year 2000, there was an additional over-collection of nearly $666,000.00 of SFI Period Costs through ENO's fuel adjustment clause. Mr. Walsh opined that ENO's treatment of SFI Period Costs violated Council Resolution Nos. R-76-135 and R-76-179 regarding its treatment of SFI Period Costs. He opined that the resolutions provided that these costs are non-fuel related fixed expenses and thus should not be recovered through the fuel adjustment clause.
Mr. Walsh also testified that several independent reviews were conducted of ENO's fuel adjustment clause mechanisms. As a result of one such review, by CPA accounting firm Ernst & Young in 1991, the firm stated:
Although excluding these charges would not decrease monthly electric fuel adjustment charges by an appreciable amount, the relatively fixed and predictable nature of this non-fuel expense makes recovery through electric base rates more appropriate. Such a change in the manner in which SFI [P]eriod [C]osts are recovered should be considered in the context of NOPSI's next application for rate relief.
Based on the Ernst & Young review, Mr. Walsh indicated that Entergy was advised to apply for a base rate increase as it made the "recovery through base rates more appropriate." However, he indicated that ENO never attempted to change its mechanism of recovery for non-fuel SFI Period Costs through the fuel adjustment clause.
He further indicated that in 1990, another independent examination was conducted by the FERC.[10] This examination determined that ENO used the wrong expense accounts to classify search in all stores costs assigned by SFI lending. He testified that this independent review gave further support to Ernst & Young's recommendations. He stated that the FERC made its recommendations and findings based on an audit of ENO's records from the period of January 1, 1990 through December 31, 1993. He testified that specifically, the FERC found:
a. SFI incurred rent and other expenses for oil storage tanks it leased and expenses such as inspecting, loading, unloading, repairs, maintenance, clean-up, rent, property taxes, depreciation, and leasehold improvements for tanks it owned.
b. Besides tank storage costs, SFI incurred administrative expenses and interest related to the acquisition and storage of oil inventory.
c. SFI billed its costs related to the oil program each month to those Operating Companies, including ENO, that had an ownership share in SFI.

*90 d. ENO classified its allocated share of Period Costs billed by SFI in the Uniform Systems Account designated as "Account 501, Fuel."
e. ENO should have classified the various costs billed by SFI as if it incurred the costs directly in various operating expense accounts, instead of using Account 501.
f. Recommended that ENO adopt the necessary procedures to ensure it classifies charges from SFI effective January 1, 1997, according to the appropriate expense accounts.
g. Noted that in a coverletter dated February 26, 1997, ENO agreed in a letter to the FERC dated February 19, 1997, that it would adopt the FERC's recommendations.
Mr. Walsh testified that although the FERC "implied" that ENO would adopt its recommendations to change its accounting practices of reporting SFI Period Costs in Account 501, ENO responded to the FERC via letter on February 19, 1997, setting forth its desire to continue reporting SFI Period Costs in Account 501. ENO reiterated the same stance in two subsequent letters to the FERC dated May 8 and May 28, 1997, respectively.[11]
Mr. Walsh stated that ENO admitted that it was aware that SFI Period Costs were fixed costs in a letter dated February 28, 1996. He opined that had ENO followed the FERC's recommendation to report SFI Period Costs to the appropriate account, rather than to Account 501, these Period Costs would not have been passed on to ENO's customers via the fuel adjustment clause.
Mr. Walsh concluded that ENO had not adhered to the Council's resolutions through its improper inclusion of SFI Period Costs in its fuel adjustment clause filings. He testified that these costs are non-fuel related fixed expenses that should not be recovered through the fuel adjustment clause.
John H. Chavanne, testified as an expert for the Sewerage & Water Board, intervenor in this matter.[12] He agreed with the conclusions of Mr. Janssen and Mr. Walsh that SFI Period Costs were improperly included in ENO's fuel adjustment clause filings from May 1985 to date. Mr. Chavanne testified, "as non-fuel costs, SFI Period Costs are not properly recoverable through ENO's fuel adjustment clause." He further opined that in Entergy's fuel adjustment clause, the language itself indicates that it just refers to fuel costs, and not non-fuel costs.
Steven Ruback also testified on behalf of the Plaintiffs.[13] He was qualified as an expert in "fuel adjustment clause analysis *91 and policy." He found that the consequence of ENO's inclusion of SFI Period Costs in its fuel adjustment clause has been the over-recovery of Period Costs, which have inappropriately flowed through ENO's fuel adjustment clause to ratepayers.
Mr. Ruback testified that there are two basic and important aspects of fuel adjustment clause regulation, the most important of which is that the fuel adjustment clause is an exception to the long-standing and well-established principles used to set base rates. Fuel adjustment clauses are also an exception to the regulatory compact because fuel adjustment charges, particularly automatic fuel adjustment clauses, only require a perfunctory hearing, and effectively strip a utility of an important incentive to minimize the costs flowing through the fuel adjustment clause, and provide for the recovery of included expenses without the necessity of a base rate proceeding.
Mr. Ruback testified that base rates should allow the utility the opportunity to recover prudently incurred operating and maintenance expenses, taxes and a fair return on investment that is used and useful in providing utility service, while fuel adjustment clauses are only intended to flow through any increases or decreases in fuel costs that are not included in base rates. He explained that the regulatory compact is deeply rooted in traditional utility regulation, and that such a regulatory compact exists between ENO and its customers. He stated that the regulatory compact requires that base rates be set for the time period that the rates are expected to be in effect and provides a utility with a monopoly for electric service within its service area. He indicated that base rates are prospective and are intended to allow the utility the opportunity to earn a fair rate of return. The basic "bargain" implicit in the regulatory compact is that the utility is granted a monopoly in the service area in exchange for a public service obligation to provide safe and reliable service at just and reasonable rates.
He testified that the regulatory compact also requires that the base rates not be changed between base rate cases, which provides the utility with a powerful incentive to minimize costs, minimize increases in costs, and to search for deficiencies in other areas of its operations to offset cost increases between the time base rates are set and when the base rates become effective. He explained that this incentive is powerful because the utility keeps any cost savings between rate cases, but must absorb any cost increases, and without this inducement there would be little incentive for the utility to minimize costs.
He noted that by including Period Costs in the fuel adjustment clause, ENO rids itself of any incentive to minimize Period Costs, such as fixed charges, interest expense, operation and steam expense, general and administrative expenses and amortization of successful exploration activities. Without meaningful competition, an allowance of Period Costs in the fuel adjustment clause basically eliminates any incentive ENO has to minimize these costs. Therefore, allowing ENO to include Period Costs in the fuel adjustment clause is a failure of regulation, which is intended to be a surrogate for competition, in order to provide an incentive to minimize costs.
Mr. Ruback testified that there is no incentive to minimize Period Costs when such costs are included in the fuel adjustment clause because ENO is not at risk to absorb cost increases between base rate cases, and has no incentive to reduce Period Costs because ENO is not allowed to retain the savings between rate cases. He testified that the consequences are higher bills than are necessary for safe and reliable service to customers. The inclusion *92 of Period Costs in the fuel adjustment clause is a recipe for unjust and unreasonable rates and is an unusual exception to the costs typically included in fuel adjustment clauses.
Mr. Ruback testified that the only costs properly included in the fuel adjustment clause are costs which are: (1) large enough; (2) volatile enough; and (3) substantially beyond a utility's control. If costs are not large enough, volatile enough or beyond a utility's control, such costs should be included in base rates to provide an incentive to minimize costs. He pointed out that period or overhead costs should clearly not be included in the fuel adjustment charge but should be included in base rates, whenever ENO files for a base rate increase.[14]
I am mindful of the amount of discretion owed to the Council, as regulator. However, after reviewing the record in this matter, I do not find that it supports the Council's decision. Based on the testimony and evidence in the record, I would find that the Council abused its discretion in refusing to order a refund of the SFI *93 Period Costs passed through ENO's fuel adjustment clause to ratepayers.
In Entergy Gulf States, Inc. v. Louisiana Public Service Commission, supra, the LPSC conduced an investigation of Entergy Gulf States' ("Company") fuel adjustment clause filings between 1988 and 1994. This Court explained that "under the fuel adjustment clause exception, a utility company is allowed to charge fuel costs directly to its customers on a monthly basis with only a retrospective review by the Commission. This procedure is allowed because the cost of fuel fluctuates, cannot reasonably be predetermined, and therefore, cannot be pre-set by the Commission." Entergy Gulf States, 726 So.2d at 873. In that case, the Commission ordered refunds of certain fuel adjustment clause charges associated with the Company's gas storage facility.[15] The Commission found that even though the expenses were not imprudently incurred, they were not properly recoverable through use of the fuel adjustment clause; rather, those costs were appropriate for consideration in a base rate proceeding. Id. at 874. The Commission reasoned that even though the expenses were fuel related, they were not properly recoverable through the fuel adjustment clause because they were predictable and constant. Id. The Commission noted that predictable costs should be considered in a base rate proceeding, which examines whether base rate offsets exist that would preclude a rate increase, and that base rate offsets are not considered in fuel proceedings. Thus, the Commission stated that it is essential to make sure that base rate costs are not passed through the fuel clause, even when they are portrayed as fuel-related. Id. at 874.
In explaining why these charges were disallowed, this Court noted:
The Commission found this practice objectionable because the expenses, which are not truly fuel expenses although they are related to fuel, are not properly recoverable through the use of the fuel clause. Rather, because these costs are considered predictable, known, or measurable costs, they are properly base rate charge items and the Company is required to bring the expenses before the Commission for its approval and inclusion in the base rate in an annual base rate proceeding. The Commission evaluates the Company's total revenue requirements and determines if such expenses warrant an increase in rates only in base rate proceedings. The Commission explained that to allow the Company to use the fuel clause to pass through these costs directly to customers would allow the Company to circumvent the rate making process.
Id. at 890.
And, particularly relevant to this matter, the Commission noted that what made the Company's activity even more objectionable to the Commission was the fact that the Company was under a base rate freeze during part of the review period, which would have precluded the Company from recouping these expenses properly through a base rate increase. Thus, the inclusion of these charges during the freeze through the use of the fuel clause effectively circumvented the effects of the base rate freeze. Id. at 890-891.
This Court found no error in the Commission's decision ordering the refund, and affirmed the decision.
*94 I find no legitimate reason to distinguish ENO's actions from those in the Entergy Gulf States case. In my view, the SFI period charges are not related to fluctuating fuel charges, and are not otherwise the type of charges that are properly included in the fuel adjustment clause. Thus, ENO improperly billed these charges to its customers, regardless of whether the charges themselves were prudent. The Council, as regulator, should have ordered a refund of these improperly billed charges. Most egregious in my mind is the fact that ENO was under a base rate freeze during much of the period at issue. Thus, had ENO attempted to realign SFI Period Costs to base rates during these years, it would not have been permitted to recover them. Instead, these costs were improperly passed through the fuel adjustment clause, thus enabling ENO to bypass the rate freeze.
For these reasons, I must respectfully dissent from the majority opinion.
NOTES
[1] ENO was formerly known as New Orleans Public Service, Inc. or "NOPSI."
[2] Entergy owns five electric public utility operating companies that provide retail electric service: Entergy Louisiana, Inc. ("ELI") (formerly known as Louisiana Power & Light Company, or "LP & L"); Entergy Arkansas, Inc. ("EAI") (formerly known as Arkansas Power & Light Company, or "AP & L"); Entergy Gulf States, Inc. ("EGS") (formerly known as Gulf States Utilities Company, or "GSU"), which operates in both Texas and Louisiana; Entergy Mississippi, Inc. ("EMI") (formerly known as Mississippi Power & Light, or "MP & L"); and ENO.

Each of these companies, along with Entergy's service company subsidiary, Entergy Services, Inc. ("ESI"), are signatories to the Entergy System Agreement (the "System Agreement"), a 1985 Federal Energy Regulatory Commission ("FERC") approved rate schedule. The System Agreement governs the planning, operations, and sharing of the costs of the Entergy System and the Entergy companies and has "provided the contractual basis for planning and operating the companies' generating units on a single-system basis, and also have provided the basis for equalizing certain cost imbalances that result from this method of planning and operating the units." Middle South Energy, Inc., Docket No. ER XX-XXX-XXX, 31 FERC ¶ 61,305, 61,636 (1985), rehearing denied, 32 FERC ¶ 61,425 (1985), aff'd, Mississippi Industries v. F.E.R.C., 808 F.2d 1525 (D.C.Cir.), vacated in part on reconsid., 822 F.2d 1103 (D.C.Cir.) (en banc), on remand sub nom., System Energy Resources, Inc. MSU System Resources, Inc., 41 FERC ¶ 61,238 (1987), reh'g denied, 42 FERC ¶ 61,091 (1988), aff'd sub nom., City of New Orleans v. FERC, 875 F.2d 903 (D.C.Cir. 1989), cert. denied, 494 U.S. 1078, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990).
[3] EPI is a wholly owned subsidiary of Entergy which generates and sells electric energy into the wholesale market.
[4] The plaintiffs simultaneously filed a lawsuit with the Civil District Court alleging that the same inclusions in the FAC were the result of an antitrust conspiracy among ENO, Entergy and ESI. The plaintiffs seek treble damages calculated as three times the amount of the refunds ordered in the Council's regulatory proceeding, i.e., the case before us now. The antitrust lawsuit, since removed to federal district court, has been stayed pending a final decision in this case.
[5] We have described an FAC as "`a fixed rule under which future rates to be charged the public are determined" and "simply an addition of a mathematical formula to the filed schedules of the [c]ompany under which the rates and charges fluctuate as the wholesale cost of gas to the [c]ompany fluctuates." Id. (Citing City of Norfolk v. Virginia Electric & Power Co., 197 Va. 505, 90 S.E.2d 140, 148 (1955)).
[6] For a discussion of base rates, see pages 73-74, infra.
[7] Arkansas Electric Cooperative Corporation ("AECC") is an entity from which ENO occasionally purchases power through its affiliate EAI. The "AECC energy adder" represents the operation-and-maintenance costs associated with the electric power generation purchased from AECC.
[8] In the paragraphs directly preceding the court of appeal's conclusion as to SFI Period Costs, the court stated:

The record reveals that the Appellants and the Advisors of the City Council alleged that ratepayers were overcharged by approximately $26 million dollars, plus compound interest from 1985 through 2000. This was not because the SFI Period Costs were imprudently incurred, but rather because SFI Period Costs should not [sic] have been included in ENO's base rates and not its FAC. However, the record also indicates that the parties in this matter did not assert that the City Council resolution explicitly allows for the recovery of SFI Period Costs through the FAC.
The record also indicates that Mr. Walsh testified that the City Council explicitly stated which fuel expense accounts should be recovered through the FAC. He also testified that the FERC determined, after an audit which concluded in 1997, that SFI Period Cost expenses should not be included within account 501, but rather in other specific accounts and thus not charged through the wholesale FAC.
The record also indicates that in LPSC Docket No. 21497, the LPSC conducted an investigation concerning the FACs of jurisdictional electric utilities. In this order, the LPSC issued its General Order U-21497 in which it revised the format in which the FAC filings are to be made, providing for the realignment of certain costs, including SFI Period Costs, from FAC recovery to base rates, and establishing certain reporting and other requirements relating to LPSC jurisdictional FACs. As noted earlier in this opinion, General Order No. U-21497, which provides for the realignment of base rates, applies prospectively only, as evidenced by the LPSC's provision that such costs are realigned on a revenue-neutral basis only if recovery through base rates is commenced at the time such recovery are removed from the FAC calculation.
Keeping these issues in mind, the record indicates that even though the LPSC ordered a prospective realignment of costs, this action does not indicate that any of those realigned costs had been improperly recovered through the FAC in prior periods, and furthermore, LPSC General Order No. U-21497 did not establish that any particular costs component was improperly included in FAC filings prior to the revenue-neutral realignment prescribed by the LPSC.
The record also indicates that while independent audits of the FAC mechanism were conducted, there was no evidence that such FAC audits were ever made the subject of extensive review by the City Council, and that any inaction with respect to the City Council cannot be deemed to have been in concert with ENO.
Additionally, the record indicates that the ratepayers were not harmed by ENO's inclusion of SFI Period Costs for several reasons, to wit: (1) first, no party challenged the prudence of the SFI Period Costs, and therefore, the City Council is required to allow ENO to recover such costs in either the FAC, or base rates; (2) ENO does not earn a return on the recovery of SFI Period Costs through its FAC, but ENO would if the costs were recovered through its base rates.
The record also reveals that no evidence was introduced by the Appellants to support their claim that the inclusion of the SFI Period Costs in ENO's FAC filings were: (1) the result of any intention to harm or deceive ENO's ratepayers; (2) the result of any manipulation or abuse of the FAC to the detriment of ENO's ratepayers; or (3) the result of any agreement between ENO and its affiliates to harm the ratepayers; or (4) fraudulent. These findings are consistent with the System Agreement as discussed in the LPSC's findings in Delaney.
Since it appears that the matters asserted by the Appellants are essentially identical to those claims raised by the plaintiffs in the Delaney case, the record does not support the Appellants' claims of arbitrariness, capriciousness, or an abuse of discretion in the City Council's determination that it did not abuse its role as an administrative adjudicator in refusing to order refunds to the Appellants for alleged overcharges billed by ENO to ratepayers through its FAC charges. Therefore, we find that this assignment of error does not have merit, and conclude that the district court was also correct in affirming the Resolution of the City Council as to its findings in the administrative proceeding.
977 So.2d at 275-277.
[9] The "margin" is the mathematical formula that dictates whether ENO purchases power from its Entergy System affiliates or from third parties in the wholesale power market.
[10] Specifically, with respect to the margin, the court of appeal concluded:

Therefore, we find that this assignment of error does have merit and conclude that the City Council acted arbitrarily and capriciously in ordering refunds which are grossly disparate to the refunds ordered in Delaney for identical claims. In all fairness to the parties, we conclude that the City Council's order of refunds falls short in providing an adequate remedy to the ratepayers for the violation found by the City Council. We conclude that the appropriate refund for the ratepayers is the $34.3 million dollar amount originally suggested by Advisors of the City Council. This refund should result in an average amount of $191 per person for the 180,000 ratepayers.
Id. at 297.
[11] Section 3-101 Legislative Powers.

(1) All legislative powers of the City shall be vested in the Council and exercised by it in the manner and subject to the limitations hereinafter set forth.
[12] Section 3-130. Establishment of Rates.

(1) The Council of the City of New Orleans shall have all powers of supervision, regulation, and control consistent with the maximum permissible exercise of the City's home rule authority and the Constitution of the State of Louisiana and shall be subject to all constitutional restrictions over any street railroad, electric, gas, heat, power, waterworks, and other public utility providing service within the City of New Orleans including, but not limited to the New Orleans Public Service, Inc. and the Louisiana Power and Light Company, their successors or assigns.
[13] Section 3-130. Establishment of Rates.

(2) In the exercise of its powers of supervision, regulation and control of any street railroad, electric, gas, heat, power, waterworks, or other public utility, the Council shall, in cases involving the establishment, change or alteration of rates, charges, tolls, prices, fares or compensation for service or commodities supplied by such utilities, cause notice of the matter to be served upon the person, firm or corporation affected thereby, so that such person, firm or corporation shall have an opportunity, at a time and place to be specified in said notice, to be heard in respect to said matter. The Council shall make all necessary and reasonable rules and regulations to govern applications for the fixing or changing of rates and charges of public utilities and all petitions and complaints relating to any matter pertaining to the regulation of public utilities, and shall prescribe reasonable rules and regulations to govern the trial, hearing and rehearing of all matters referred to herein....
[14] In Daily Advertiser, one of the issues involved whether a regulator's subsequent review and modification of FACs after they had been charged and recouped by the utility constituted "retroactive ratemaking," which is prohibited. This Court found that the rule against retroactive ratemaking did not apply to the regulator's retrospective review and subsequent modification, adjustment, or refunds of such rates. 612 So.2d at 23-24. See also Entergy Louisiana, LLC, supra, 990 So.2d 716.
[15] Later in the Resolution and Order, when ruling on whether to impose interest on other amounts refunded, the Council remarked: "[w]ith respect to the SFI issue we discussed earlier, where our conclusion was that fairness and equity required us to not impose what would have otherwise been a substantial disallowance, we exercised our discretion in favor of the Company. In this instance, again employing fairness and equity, we exercise our discretion in favor of ratepayers."
[16] The Council, rather than the LPSC, has jurisdiction over ELI to the extent of its operations in Algiers.
[17] The Council also relied on Docket No. UD-01-04, wherein ENO proposed and the Council authorized prospectively ENO's recovery of SFI Period Costs through the FAC. However, while the Council may have been aware of this situation, there have been no record citations for UD-01-04 and we could not locate it in the very voluminous record.
[18] The LPSC also explained the history of the FAC as follows:

On April 23, 1975, the Commission adopted a General Order regarding "Cost of fuel and purchased power adjustment clauses." ("April 23, 1975 General Order"). In that Order, the Commission recognized that in various prior orders it had permitted electric utilities to "pass along the increased costs of fuel or increased costs of purchased power, as the case may be, by making submissions of cost data to the Commission and requesting that the increment over base cost be approved for pass-along to the consumer on the next billing." Id. These prior Commission actions were approved on a company-by-company basis without general industry-wide guidelines. The Commission noted that "the past several years have seen predominantly rising fuel costs and an apparent shortage of fuel in virtually every sector of the economy." Id. In its earlier orders, the Commission had noted that the price of natural gas was "ever increasing" and that there was a "continuing upward trend thereof." Commission Order No. 7762. These flow-throughs of fuel costs permitted the utilities to recover their actual costs of fuel in a timely manner. This mechanism avoided the requirement by electric utilities to file base rate cases to recover their fuel costs. The Commission also noted that the mechanisms in place would "also operate to reduce electric billings in times of decreasing fuel costs." Id.
The Commission acknowledged the importance of permitting flow-throughs of this major costs component of electric generation and recognized that clauses of this type were in use nationwide. However, the Commission noted the difficulty customers were having in understanding the significant increases in their monthly electric bills. In order to increase consumer confidence, the Commission provided for monthly hearings and public participation regarding a company's fuel clause filing. In 1991, the Commission discontinued the monthly public fuel adjustment hearings. Thereafter, electric utilities were required to continue to file their monthly fuel adjustments under oath and in writing only. The Commission, however, continued to allow requests for hearings by any interested party or consumers.
...
Over the years, disputes periodically developed between the Commission Staff and the electric utilities as to which costs may properly be included in a company's fuel adjustment clause.... These disputes developed, at least in part, because the Commission's April 23, 1975 General order did not contain detailed standards regarding what is includable in and what is excludable from the fuel clause. The Commission's recent fuel clause investigations of EGSI demonstrated the magnitude of the differences in the opinions of the Commission and the utilities regarding which costs may be properly recovered through the fuel clause. This proceeding was instituted to delineate includable and excludable costs and to establish uniform standards for all electric generating utilities in the State. These standards will also facilitate the Staff's review of the utilities' fuel clause filings.
[19] Includable costs were: (1) the direct cost of fuel from a nonaffiliated party; (2) direct cost of fuel purchased from affiliated party at the lower of cost or market with the cost of the affiliated party determined in the same manner as if the electric generation utility incurred the costs directly unless such direct costs of fuel are allocated pursuant to a FERC-approved tariff, in which case the utility shall include the direct costs of fuel established by the FERC; (3) cost of fuel treatment; (4) cost of transportation of nonaffiliated party; (5) cost of transportation by affiliated party at the lower of cost or market and if the transportation cost is a direct function of the volume of fuel transported, with the cost of affiliated party determined in the same manner as if the electric generation utility incurred the costs directly; (6) costs of emission reagents such as limestone: (7) cost of nuclear fuel amortization expense dependent upon burn; (8) cost of nuclear fuel disposal dependent upon burn imposed by the government; (9) cost of interest expense on leased nuclear fuel; (10) cost of emergency and economy purchased power including short term reservation charges but excluding investment related costs and including transmission costs to nonaffiliated parties; (11) energy cost of other purchased power upon specific Commission review and approval preferably within a base rate proceeding, excluding demand, capacity, facilities charges, and reimbursements for fixed costs recovered by the utility through base revenues, whether explicitly identified or subsumed within an energy charge; (12) revenues from emergency and economy sales to affiliated and nonaffiliated parties; and (13) energy revenues from firm sales, excluding demand, capacity, and facilities charges whether explicitly identified or subsumed within an energy charge, regardless of whether sales are to affiliated or nonaffiliated parties.
[20] Excludable costs were: (1) nonfuel operation and maintenance costs; (2) procurement costs; (3) fuel handling testing costs; (4) cost (net of sales revenues) of byproduct disposal; (5) property taxes including ad valorem taxes; (6) depreciation and amortization costs (other than nuclear fuel); (7) lease expense (other than nuclear fuel); (8) interest expense or carrying charges on capital investments and inventories; (9) purchased power demand, capacity, or facilities charges whether explicitly identified or subsumed within an energy charge, regardless of whether affiliated or nonaffiliated parties; (10) cost of and revenues from transmission for affiliated parties; and (11) firm sales revenue for demands, capacity, or facilities whether explicitly identified or subsumed within and energy charge, regardless of whether made to affiliated or nonaffiliated parties.
[21] Expert testimony from the other experts conflicted over whether a refund should be ordered.
[22] Resolution R-76-135 revised the FAC to read:

Fuel Adjustment
Plus or minus the product of the kilowatt-hours used by the Customer during the month multiplied by the amount that the average fossil fuel cost per kilowatt-hour as delivered to Company's customers in the City of New Orleans during the second preceding month is more or less than .200 cent.
Resolution R-76-179 revised the FAC to read:
Fuel Adjustment
Plus or minus the product of the kilowatt-hours used by the Customer during the month multiplied by the amount that the average fossil fuel cost per kilowatt-hour as delivered to Company's customers in the City of New Orleans during the second preceding month, adjusted for any over or under collection of actual fuel costs that occurred during the second preceding month, is more or less than .200 cent.
[1] The summary of Mr. Janssen's testimony is adapted from the court of appeal opinion. Gordon v. Council of the City of New Orleans, XXXX-XXXX (La.App. 4 Cir. 2/25/08), 977 So.2d 212, 248-256.
[2] Janssen testified about a July 29, 1974 audit of NOPSI (now ENO) performed by the Department of Utilities. The purpose of the study was to determine if the fuel adjustment charges for May and June 1974 were correctly computed. The City of New Orleans Inter-Office Memorandum attached to the report stated that: "it was concluded that the fuel charges as computed by Public Services were substantially correct except for certain administrative and interest charges assessed by System Fuels to Public Service for fuel oil which we do not consider to be properly chargeable to the cost of fuel within the meaning of the fuel cost adjustment clauses in the rate schedules. Departmental action will be taken to credit these charges in future customer billings." The report also makes specific reference to administrative and interest components of SFI Period Costs, stating that this charges was not applicable in computing the fuel adjustment clause to customers, and noting that such charges were absorbed by NOPSI prior to the formation of SFI, and suggested that amounts previously billed to customers be credited to a future period fuel cost adjustment.
[3] ENO was under an agreed upon base rate freeze for ten of the fifteen years that were under review in this matter. The record reveals that ENO was under a base rate freeze from March 20, 1986-January 1, 1998, September 5, 1991-November 1, 1996, and November 5, 1998-October 1, 2001.
[4] He explained that the FERC has developed general principles and specific guidelines for both reviewing and ordering refunds on utilities' wholesale fuel adjustment clauses across the country. He indicated that these principles and guidelines can be found in various orders issued by the FERC in audits performed by its Staff. The orders and audits that he specifically reviewed and relied upon are: (1) FERC Orders in Docket No. ER76-285 (Phase II); (2) FERC Orders in Docket No. E-8570,(3) FERC's April 1977 Report on Results of Audit related to Charges for wholesale Electric Service by Mississippi Power and Light Company under Fuel Adjustment Clauses filed with the Federal Power Commission; and (4) FERC Orders in Docket Nos. FA86-63-000 and FA86-63-001.

Regarding Docket No. ER76-285 (Phase II), he testified that the FERC issued two (2) relevant orders: (1) Opinion No. 37, 6 FERC P 61,299, dated March 30, 1979 and (2) a November 19, 1979 order, denying rehearing. Specifically, these orders provide general principles related to retroactive rate-making and the prudence of costs passed through fuel adjustment clauses. He also stated that in the same proceeding, the FERC found that the Public Service Company of New Hampshire (PSNH) imprudently passed through its fuel adjustment clause, costs related to spot market purchases of 204,000 tons of coal when alternative supplies of cheaper coal were available. The FERC ordered PSNH to refund these imprudently incurred costs, plus interest.
He testified that the general principles contained in the FERC Docket No. ER76-285 (Phase II) are as follows:
 Public utility regulators have the ability to review the fuel adjustment clauses of their jurisdictional utilities to determine the prudence of costs recovered from their customers;
 Orders for refunds based on reviews of fuel adjustment clauses are not barred by principles against retroactive rate-making;
 Valid fuel clause formulas allow the inclusion of fuel expenses that are just and reasonable. If costs are included that should have been collected elsewhere, then one of the elements necessary for proper computation of fuel adjustments has been misstated; and
 Any inequities resulting from fuel adjustment clauses should be discovered through surveillance and can be remedied through complaint proceedings. The responding utility should their present an affirmative defense.
Mr. Janssen further testified that in Docket No. E-8570, the FERC issued two orders relevant to this proceeding: (1) the Initial Decision on non-fuel costs adjustment issue, dated July 20, 1976; and (2) the April 26, 1970, order that Affirmed in Part and Modified in Part an initial decision on fuel adjustment clauses. These orders explained the intent and purpose of fuel adjustment clauses and the eligibility of certain types of costs to be included in fuel adjustment clauses. In the same proceeding, the FERC found that the Southern California Edison Company improperly included several costs in its fuel adjustment clause and it ordered the Southern California Edison Company to refund these improperly included costs, plus interest.
In Docket No. E-8570, he indicated that the general process from the proceeding is as follows:
 The intent and purpose of fuel adjustment clauses is to reflect changes in only the fuel component per kilowatt of energy cost and that this should be strictly construed.
 The cost of capital to acquire fuel and to maintain an adequate fuel inventory is not subject to treatment any different from the cost of capital for any other purpose. Financing costs are clearly not the kind of costs that may or should enter into computations under Commission-approved fuel adjustment clauses.
 The FERC's policy is to scrutinize costs reflected in fuel adjustment clauses to make sure only eligible fuel expenses are covered through the monthly fuel charge.
 The substance of costs is more important than the form when determining what costs are includable in fuel adjustment clauses.
 Fuel exploration and development costs should not be included in fuel adjustment clauses. A properly conceived and applied fuel adjustment clause cannot reflect such fixed, known in measurable costs without doing violence to both the intended purpose and the very rationale supporting the allowance of flow-through of particularly volatile fuel costs.
 Considerations of prudence are irrelevant to a proper determination of the legitimate fuel costs components includable in fuel adjustment clauses.
He also noted that in the FERC's April 1977, Report on Results of Audit related to Charges for wholesale Electric Service by Mississippi Power and Light Company under fuel adjustment clauses filed with the Federal Power Commission, the FERC's auditors published a report documenting their analysis of SFI Period Costs included in Entergy's wholesale fuel adjustment clauses and reached an agreement with the Entergy Operating Companies that excluded SFI Period Costs from inclusion in wholesale fuel adjustment clauses on a prospective basis. Additionally, he noted that the general principles contained in this April 1970 report are as follows:
 Utilities should not have the opportunity to recover through fuel adjustment clauses any fuel costs which ordinarily are incurred directly by utilities after obtaining delivery of fuel to the unloading point.
 Although costs may be proper cost of service items to be considered in setting utility base rates, they may not be properly accounted for as cost of fuel and therefore would be improperly included in fuel adjustment clauses.
Mr. Janssen stated that in FERC Docket Nos. FA86-63-000 and FA86-63-001, the FERC issued several orders and discussed the practice of Entergy Louisiana Inc. (ELI), as well as other Entergy Operating Companies, of passing SFI Period Costs through their wholesale fuel adjustment clauses. He testified that the orders and documents in these proceedings revealed that in both the late 1970s and early 1980s the FERC determined that SFI Period Costs were improperly included in the fuel adjustment clauses of Entergy Operating Companies since those costs were not properly included in the FERC's System of Accounts as a fuel cost. In the late 1980s, Mr. Janssen noted, the FERC auditors found that ELI had reintroduced SFI Period Costs into its wholesale fuel adjustment clause, contrary to its previous agreement with the FERC documented in the April 1977 report. The FERC determined that the SFI Period Costs were improperly included and these costs were subsequently refunded to ELI's wholesale customers. The general principles found in these orders are as follows:
 Costs not properly includable in FERC Accounts as fuel costs are not properly recoverable from customers through fuel adjustment clause billings.
 `[W]hile an automatic adjustment clause such as the fuel adjustment clause is part of the filed rate, the components of such clause remains subject to review and modification to ensure that only eligible cost items are flowed through to customers in the clause.'
 `[D]ue to the prohibition against retroactive rate-making, utilities which choose to disregard our accounting and rate regulations face the risk of permanently forfeiting every dollar, with interest, that they improperly recovered through their fuel clauses....'
[5] In 1997, the LPSC issued a general order in Docket No. U-21497, which explicitly stated that in general, only the direct cost of fuel delivered to the plant site and other fuel related costs that are directly dependent upon the level of electricity generation or the energy cost of purchase power are recoverable through the fuel clause, and that the fuel clause should not be considered a supplement to or utilized to avoid the normal base rate-making process for incremental base rate costs and without the full consideration of all revenue requirements issues. Specifically excluded are: nonfuel operation and maintenance costs (accounting and other administrative costs); procurement costs (salaries, wages and overheads for personnel in fuel purchasing department); fuel handling and testing costs (personnel, equipment, and other overhead costs related to coal inventory at plant site); costs of byproduct disposal; property taxes; depreciation and amortization costs; lease expense; interest expense or carrying charges on capital investments and inventories; purchased power demand, capacity, or facilities charges; costs of and revenue from transmission for affiliated parties and firm sales revenue for demands, capacity or facilities.
[6] Janssen clarified that of the 35.3 million in Period Costs included in ENO's fuel adjustment clause during the 171 months he examined, approximately 12.8 million occurred during the three base rate freeze periods.
[7] Mr. Janssen testified that in accounting for the depreciation of the majority of its fuel oil storage and handling facilities, SFI uses the double-declining balance method over a 16-year period, and that the use of this method allocates a larger amount of expense to the early years in which equipment is utilized and a decreasing amount in later years until the asset is fully depreciated after 16 years.
[8] The majority noted this internal memo, but discounted its value on the basis that the Council allegedly already knew ENO was passing these costs through the fuel adjustment clause.
[9] The summary of Mr. Walsh's testimony is adapted from the court of appeal opinion. Gordon v. Council of the City of New Orleans, XXXX-XXXX (La.App. 4 Cir. 2/25/08), 977 So.2d 212, 271-274.
[10] FERC, Docket No. FA-17-000.
[11] The letter of May 28, 1997, particularly discussed expansion of ENO's SFI oil program strategy and included a statement indicating that Entergy was pursuing a plan to discontinue utilizing SFI to provide fuel oil and related storage services to the companies. However, Mr. Walsh indicated that the Entergy Operating Companies' dependence on SFI continues and that Entergy's plan never came to fruition. Thus, the FERC specifically identified Entergy's improper reporting of SFI Period Costs in Account 501 and subsequently recommended the correct accounting treatment. However, for reasons unknown, Mr. Walsh noted that ENO continued reporting its SFI Period Costs without any change from its historically applied method of flowing fixed costs through its fuel adjustment clause.
[12] The summary of Mr. Chavanne's testimony is adapted from the court of appeal opinion. Gordon v. Council of the City of New Orleans, XXXX-XXXX (La.App. 4 Cir. 2/25/08), 977 So.2d 212, 260-261.
[13] The summary of Mr. Ruback's testimony is adapted from the court of appeal opinion. Gordon v. Council of the City of New Orleans, XXXX-XXXX (La.App. 4 Cir. 2/25/08), 977 So.2d 212, 256-260.
[14] Mr. Ruback also testified that he agreed with several regulatory principles referred to in Mr. Janssen's testimony:

 Public utility regulators have the ability to review the fuel adjustment clauses of the jurisdictional utilities to determine the prudence of costs recovered from their customers;
 Orders for refunds based on reviews of fuel adjustment clauses are not barred by principles against retroactive rate making;
 Valid fuel clause formulas allow the inclusion of fuel expenses that are just and reasonable. If costs are included that should have been collected elsewhere, then one of the elements necessary for proper computation of fuel adjustment has been misstated;
 Any inequities resulting from fuel adjustment clauses should be discovered through surveillance and can be remedied through complaint proceedings. The respondent utility should then present an affirmative defense;
 The intent and purpose of fuel adjustment clauses are to reflect changes in only the fuel component per kilowatt energy cost and this should be strictly construed;
 The cost of capital to acquire fuel and to maintain an adequate fuel inventory is not subject to treatment any different from the cost of capital for any other purpose. Financing costs are clearly not the kind of costs that may or should enter into computations under the Council approved fuel adjustment clause;
 Fuel exploration and development costs should not be included in fuel adjustment clauses. A properly conceived and applied fuel adjustment clause cannot reflect such fixed, known and measurable costs without doing violence to both the intended purpose and the very rationale supporting the allowance of flow through particularly volatile fuel clause;
 Costs not properly includable in FERC Accounts are not properly recoverable from customers through fuel adjustment clause billings;
 While an automatic adjustment clause such as the fuel adjustment clause is part of the filed rate, the components of such clause remain subject to review and modification to ensure that only eligible cost items are flowed through to customers under this clause;
 Due to the prohibition against retroactive rate making, utilities which choose to disregard accounting and rate regulations face the risk of permanently forfeiting every dollar, with interest, that they improperly recovered or their fuel clause;
 A utility's subsidiary should not profit on transactions included in its affiliated utility's fuel adjustment clause.
 Transactions with a utility affiliate should be reviewed for prudent management judgment and acquiring fuel [or power] at the lowest competitive prices;
 As the name implies, fuel adjustment clauses are not designed to allow utility to earn a profit; rather they are a recoupment device designed to permit a dollar for dollar recovery of fluctuations in fuel costs; and
 The requirements of fairness which compels adjustment in rates to compensate utilities for escalating fuel costs also compels retrospective reconciliation to exclude charges identifiably resulting from unreasonable computations or inclusions.
[15] These charges included certain capital costs of the gas storage facility, and certain gas inventory charges.